UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CHARLES M. MARTIN, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | Civil No. 07-156-B-W |
| | ) | |
| JEFFREY MERRILL, WARDEN, | ) | |
| MAINE STATE PRISON | ) | |
| | ) | |
| Respondent | ) | |

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION**

Charles M. Martin has filed a petition pursuant to 28 U.S.C. § 2254 seeking relief from his sixty-year sentence for the murder of Vincent Irish.  In this 28 U.S.C. § 2254 petition seeking federal relief from his state criminal judgment Martin presses two grounds.  One relates to the voluntariness of his video-taped confession and the second argues that counsel was ineffective for not sufficiently investigating his psychological history, a possible defense tactic that Martin believes would have allowed him to leverage a mens rea defense.  The State of Maine has filed a response.  For the following reasons I recommend that the Court deny Martin 28 U.S.C. § 2254 relief.

*Discussion*

Pursuant to the Antiterrorism and Effective Death Penalty Act (AEDPA) this court can grant Martin habeas relief after a final state adjudication of his two federal constitutional claims only if the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was

based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially undistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The "unreasonable application" analysis, however, affords relief only if "the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the petitioner's case." Id. at 413. "If it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application." McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir.2002). A state court's factual findings are presumed to be correct under 28 U.S.C. § 2254(e)(1).

***Brief Procedural Background***

Martin was convicted in 1989, after having pressed an unsuccessful motion to suppress arguing, among other things, that his video-taped confession at the Maine State Police Barracks in Scarborough, Maine was involuntary. Martin's conviction was affirmed by the Maine Supreme Court but in July of 1995 one of his state post-conviction grounds was deemed to have merit; the post-conviction court agreed that Martin's trial counsel was ineffective at sentencing when he introduced a damaging psychological report. In due course, Martin was resentenced and received a 60-year sentence, the same term that was imposed in 1989. In January of 2005 Marin filed a notice of discretionary appeal and in his memorandum seeking a certificate of probable cause Martin argued that

trial counsel was ineffective when he did not sufficiently investigate the possibility of

raising a psychological defense and, in a pro se pleading, that counsel was ineffective for

failing to challenge the voluntariness of Martin's incriminating statements.  On October 3,

2006, the Maine Law Court denied Martin's request for a certificate of probable cause.

### First 28 U.S.C. § 2254 Ground: Voluntariness of Martin's Video-taped Confession

The Maine Law Court, ruling on Martin's seizure and confession challenge on

direct appeal, summarized the circumstances of Martin's pre-arrest conduct, arrest, and

interrogation as follows:

> Defendant met Vincent Irish for the first time on the evening of March 26, 1988. The two drove to a secluded spot in Windham where defendant killed Irish by shooting him in the head, beating him over the head with the gun, and finally smothering him. Defendant left Irish's body in the trunk of the car and, then, unable to get the car out of the mud, went to look for a ride. Officer Fulton was driving his cruiser along Nash Road when defendant waved him down. Fulton asked defendant what he was doing. Defendant answered that he had been hitchhiking, a car had stopped for him, and the driver had threatened him with a gun. Defendant had fled, but not before seeing a body in the back seat of the car. Considering defendant a possible witness to a crime, Fulton asked him to come to the Windham police station to give a statement. Defendant agreed, and they arrived at the station shortly after midnight. There Detective Ramsdell interviewed defendant for about an hour. No Miranda warnings were given before or during this interview. Meanwhile the police had found the car with Irish's body. This in conjunction with defendant's answers led them to view him as a murder suspect, and they notified the Maine State Police. After his interview with Ramsdell, defendant was left alone until the Maine State Police officers arrived and began their interview of him around 2:00 a.m. They read defendant his Miranda rights before they began the questioning. Defendant initially answered willingly, but then demanded an attorney. The state police nevertheless continued the interrogation for some time, ending around 4:00 a.m.
> Later that morning defendant was arrested and taken to the Cumberland County jail. With him in the car were Sergeant Lyons of the Maine State Police and Detective Ramsdell. Although not questioned by the officers about the crime, defendant made several incriminating comments during this ride. On arrival at the jail defendant was taken for processing to the booking room. During processing he removed a ring

from his finger and placed it away from him on the counter, remarking that he would not be needing it where he was going. Without further <u>Miranda</u> warnings, the officers asked several follow-up questions. In his responses defendant made several incriminating remarks, including a statement that the ring belonged to Irish. Shortly after this conversation, Lyons asked defendant if he wanted to talk to a lawyer. Defendant said that he no longer wanted to speak to an attorney. He explained that he had earlier wanted an attorney to help him keep his story straight, but now that he was under arrest he no longer cared. He indicated that he was now willing to make a confession. The officers then took defendant to the Maine State Police barracks in Scarborough. On the way, defendant was not questioned but he spontaneously offered more incriminating statements. The trio arrived at the barracks around 11:15 a.m. Lyons read defendant his <u>Miranda</u> rights. Defendant then gave a full confession to the murder on videotape. After the interview, defendant, still accompanied by Lyons and Ramsdell, was given lunch. During lunch, he again asked about the death penalty in Maine and offered that he "would have done it again" if he had not gotten caught.

<u>State v. Martin</u>, 580 A.2d 678, 679-80 (Me.1990) (footnotes omitted).

In his first 28 U.S.C. § 2254 ground Martin asserts that his statement made at the Maine State Police Barracks was involuntary due to the totality of the circumstances under which he was held.  In its opinion on direct appeal, further excerpted below, the Maine Law Court identified the combined doctrine of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966) and <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981) as the gold standard by which to measure the voluntariness of Martin's video-taped confession.   In <u>Moran v. Burbine</u> the Supreme Court provides this summary of the "totality of the circumstances" inquiry:

Echoing the standard first articulated in <u>Johnson v. Zerbst</u>, 304 U.S. 458, 464 (1938), <u>Miranda</u> holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." 384 U.S., at 444, 475. The inquiry has two distinct dimensions. <u>Edwards v. Arizona</u>, <u>supra</u>, 451 U.S., at 482; <u>Brewer v. Williams</u>, 430 U.S. 387, 404 (1977). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the

> circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived. <u>Fare v. Michael C.</u>, 442 U.S. 707, 725 (1979). <u>See also</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 374-75 (1979).

475 U.S. 412, 421 (1986).

In his 28 U.S.C. § 2254 petition Martin explains that he arrived at the Windham Police Station at approximately 12:05 a.m. on March 27, 1988, and his coat, shirt, pants, shoes, and socks were wet.  (Sec. 2254 Pet. at 6.) A detective, Ramsdell, interviewed him for about twenty minutes and Martin then remained in the interview room in a straight-back chair where he dozed for ten to twenty minute intervals.  (<u>Id.</u> Attach. 1 at 1.)  He was awoken at 2:20 a.m. by Detectives Holt and Herring. (<u>Id.</u>)  Martin indicates that at the beginning of the interview he was advised of his <u>Miranda</u> rights and early on in the interview he asked for an attorney.  (<u>Id.</u>)  Martin agreed to have blood swabs taken and to allow a nitric acid test.  (<u>Id.</u>)  His damp or dump shirt, damp or dump pants, and damp or dump shoes[1] were taken and Martin was only provided with a pair of pants; nothing was provided for his upper body.  (<u>Id.</u>) At one point in the interview Holt opened the window, which he closed when Martin said he was cold; Martin was told that he would be provided something momentarily but he was never provided with anything to keep him warm.  (<u>Id.</u>)

The interview ended at about 3:30 a.m. when Martin asked for an attorney for the second time. (<u>Id.</u>)  Thereafter, Martin remained in the interview room, except for the several times he went to the bathroom because of his intestinal problems.  (<u>Id.</u>)  The only

---

[1]     In his written attachment these adjectives appear as "dump."  In other areas of his written attachments he does not close the top of his 'a' when it appears in the middle of a word and if he means "damp" it seems his description is at odds with law enforcement officers who described his clothes as soaking wet.

opportunity that Martin had to sleep during this period was when he was sitting in a straight back chair where he dozed for ten to twenty minute intervals, woke to smoke and change positions, then dozed again.  (<u>Id.</u> At 1-2.)

At approximately 9:00 a.m. Martin was woken and placed under arrest.  (<u>Id.</u> at 2.) He was given a shirt to wear at that time. (<u>Id.</u>)  He was then escorted outside to a police car, and, because Martin still had no shoes on his feet, he walked through puddles to the police car.  (<u>Id.</u>)

On the way from the Windham police station to the Cumberland County Jail Martin made several incriminating statements.  (<u>Id.</u>) Martin arrived at the jail at about 10:10 a.m. and he was taken to the booking room.  (<u>Id.</u>)  Martin asked the booking officer if he could get something to eat. (<u>Id.</u>)  Martin was told that he could have something to eat as soon as they were done.  (<u>Id.</u>)  Martin then made more incriminating statements and said that he no longer wanted an attorney.  (<u>Id.</u>)   Martin was then transported to the Scarborough, Maine State Police Barracks where he made a confession.  (<u>Id.</u>) After this confession Martin was taken to a conference room where he was given lunch; this was the first food Martin had had for the twelve hours he was in police custody.  (<u>Id.</u>)

Martin does not now raise a Sixth Amendment claim pertaining to counsel's efforts vis-à-vis challenging the voluntariness of his video-taped confession, although he did do so in his state post-conviction proceeding.  The only mention that Martin makes of counsel's performance in his 28 U.S.C. § 2254 petition is when queried why he did not exhaust his remedies for this claim Martin indicates that he did not do so because

"counsel never raised this issue" (Sec. 2254 Pet. at 5); however, this claim clearly was raised and exhausted.[2]

With regards to his straight-up challenge to the voluntariness of his video-taped confession, Martin fully litigated a challenge to the admissibility of his confessional statements, starting with a multi-layered motion to suppress and pressing it through to his direct appeal.

Counsel for Martin joined the issue of the voluntariness of Martin's video-taped confession in an amended motion to suppress that challenged the admissibility of Martin's statements to officers that night on several grounds. (State Ct. Record Vol. I,

---

[2]      Even if Martin has raised a claim of ineffective assistance of counsel apropos his attorney's performance, as he did in the state post-conviction proceeding, there is no doubt in my mind that such a claim would not survive the deferential 28 U.S.C. § 2254 review; indeed, this record testifies to the admiral efforts of Martin's attorney to assist his client through a motion to suppress in the face of extraordinarily high odds.

The general voluntariness of Martin's confession was explored during the post-conviction evidentiary hearing. (See, e.g., Nov. 11, 2001, Post-conviction Hr'g Tr. at 60; June 4, 2003, Post-conviction Hr'g Tr. at 8-24.) (Of note, Martin did concede that he dozed for six hours that night. (June 4, 2003, Post-conviction Hr'g Tr. at 21.))

With regards to the voluntariness of Martin's statements, the Post-Conviction Court explained:

The defendant was arrested just before midnight on 3/26/88 and remained with the police until 9 a.m. on the next day. He had nothing to eat and was hungry and his clothes and socks were wet. In early morning he was given dry pants, but no shirt. Because he smoked, the window was open and he was cold. He had no shoes, blanket, cot or pillow. He also alleged that he had intestinal problems and that his thinking was impaired. Finally, he alleged that he was tired and able to doze only for ten or fifteen minutes at a time and then would awaken.

Defense counsel raised the issue of the lack of footwear and food in the defendant's memorandum of law in support of his motion to suppress filed December 12, 1988. Further, the 1/27/89 decision on the defendant's motion to suppress makes clear that the defendant slept for approximately six hours between interviews and the Cumberland County Jail. See 1/27/89 Decision and Order at 9-10, 25. The motion justice determined that all of the defendant's statements were voluntary. On appeal, the Law Court determined that "the motion justice was well justified that defendant's answers and comments were voluntary…." State v. Martin, 580 A.2d 678, 682 (Me. 1990). . . .

(Order on Post-conviction Review at 2-3.)

Martin sought discretionary review by the Maine Law Court of this disposition. One memorandum was filed by counsel and one by Martin pro se. In the pro se memorandum Martin argued that his criminal attorney was ineffective "in presenting Appellant's confession was involuntary under the totality of the conditions Appellant was held under." (Pro Se Mem.Support. Probable Cause at 5; id. at 5-10.) The Maine Law Court denied Martin a certificate of probable cause, identifying this claim as an allegation of ineffective assistance "as to Martin's pretrial motion to suppress." (Order Denying Certificate of Probable Cause at 1.)

No. 4. at 2-4.)   The motion judge conducted an evidentiary hearing, commencing at 10:40 a.m. on November 12, 1988, concluding for the day at 4:38 p.m., resuming the next day at 9:45, and ending at 2:34 p.m.

During this evidentiary hearing, although the totality-of-the-circumstances theory for suppression was not the focus of the inquiry, counsel explored the general voluntariness of the confession at the Scarborough Barracks. (Suppression Tr. at 15.) The court heard testimony from law enforcement agents involved that Martin was soaking wet and disheveled when he was first brought in to the Windham police station (id. at 53-54); before the Windham interview Martin had fallen asleep (id. at 104); he had on a pair of jeans, white sneakers and a gray white t-shirt (Id. at 105); during the interview Martin was "[p]retty relaxed, apathetic, [not] hostile, [not] boisterous, pretty calm really" (id. at 105-06); and at the end of the interview Martin was comfortably situated in the interview room and was furnished with a soda (id. at 82, 98).  Martin's clothes – all of which were "soaking wet" when he arrived at the Windham station-- were taken from him by the Maine State Police as part of their initial interview (id. at 85, 117-19), he was immediately given another pair of trousers and kept his socks on (id. at 110-11, 119-20), but he remained bare-chested (id. at 119).  Ramsdell testified that he was sure that Martin had slept prior to being placed under arrest but did not think he had slept after the arrest.  (Id. at 158.)  After Martin was put under arrest and booked he was given a shirt, the officers first wanting to take booking pictures of his tattoos.  (Id. at 156-57.)  Detective Holt testified that the window to the interview room was open to allow the smoke to exit but when Martin indicated once that he was cold, the detectives closed the window, after which Martin indicated that he was fine.  (Id. at 127-28.)  During the

time at the Windham Police Station and the Cumberland County Jail Martin was not provided with any food (see, e.g., id. at 155-56), however, Detective Ramsdell testified that at no time between the time of Martin's arrest and the interview did Martin actually ask for food.  (Id. at 170.)  Sergeant Lyons, from the Maine State Police, testified that he became involved with the arrest when taking Martin from Windham to the Cumberland County Jail and then to the Scarborough Barracks.  (Id. at 172.)  Lyons testified that Martin did seem to be sleepy when he was at the Scarborough Barracks.  (Id. at 183-84.)

Martin also testified during the suppression hearing.  He told the court that at the point of his first encounter with law enforcement the evening of the murder he felt like he was being ordered by Officer Fulton to get into his cruiser and to go to the station to give a statement.  (Id. at 190-98.)   On cross-examination Martin testified that he thought he was under arrest from that point on but acknowledged that he thought he would be able to leave after the interview at the Windham station.  (Id. at 224 – 25, 228.)  He also acknowledged that he had been around the system "a little bit" and knew that they don't just let you go after you get arrested.  (Id. at 224.)

When he got to the Windham station his jacket, shirt, and pants were wet and he "was cold, scared, hungry, and tired."  (Id. at 198-99.)   He did not feel at liberty to leave the station as he was being watched by an officer and because he had been patted down prior to his questioning.  (Id. at 199-200.)   He stated that he had an even stronger sense of not being able to leave when his parents arrived at the station and he was not allowed to speak with them.  (Id.)  He stated that he was not provided with a new shirt until about five minutes prior to his arrest around 9:00 a.m., meaning that he did not have anything on his upper torso for a number of hours.  (Id. at 202.)  The effect of this was that he "was

cold, and getting scareder." (Id.)  When he informed an officer that he was cold he was advised that he would be given him something in a second but nothing was provided. (Id.) He acknowledged that when he told Detective Holt that he was cold that Holt closed the window and that Martin told Holt that he was feeling comfortable then.  (Id. at 226-27.)  His shoes were removed and he was not given any shoes until he was at the Cumberland County Jail.  (Id. at 203.)  He acknowledged that his pants were replaced immediately.  (Id. at 203-04.)  With regards to sleep opportunities, Martin testified that he was in a straight-back metal chair and did not get sound sleep; he would sleep for ten to fifteen minutes and then wake up and change positions and sleep another ten to fifteen minutes.  (Id. at 204-05.)  When the morning rolled around he was exhausted.  (Id. at 205.)  The last time he had eaten was around 10:30 p.m. (with his victim) and he was not offered any food while at either the Windham station or the Cumberland County Jail and was not given any food until noon at the Scarborough Barracks.  (Id. at 205-06.)  He testified that he told a person in the Cumberland County booking room that he was hungry and was told that he would be given something when he was done being interviewed at Scarborough.  (Id. at 206.)

Martin said that he continued answering questions after he indicated that he wanted an attorney because he was scared and confused and cold and uncomfortable.  (Id. at 207-08, 228.)   Martin told the court that when Lyons put cuffs on him as part of the arrest process he told Martin that he was going away for a long time.  (Id. at 209-10, 230.)  Martin had only socks on when he then got into the cruiser to go to the Scarborough Barracks and he had to walk through puddles in the cold.  (Id. at 210.)  He indicated that he was tired at this time and was not too aware of his environment.  (Id.)

He was also confused by the fact that Lyons was asking him general questions in a friendly tone after he had been charged with premeditated murder (id. at 214), leading Martin to feel like he could trust Lyons (id. at 215, 230).

With respect to the particulars of the video-taped confession, Martin said that he gave that statement because he thought he was "cooked" and did not feel at that point that an attorney could help him.  (Id. at 220, 237-38.)  He indicated that he would not have made that statement if Lyons had not approached him and asked him to speak to them. (Id. at 221.)  He also answered affirmatively when asked: "Is it your testimony that when you were on that videotape that you were so scared, so tired, so hungry, so confused, that you didn't know what you were doing?"  (Id. at 225, see also id. at 240.)  Martin acknowledged that he had been given the Miranda warning a number of times before, he knew his rights, had been through the system and was not dumb, knew that he did not have to talk with the police if it went against his wishes, could get an attorney if he wanted to, and that he was aware that if he told the police something they could use it against him.  (Id. at 226.)

Evidencing the seriousness in which the motion judge approached this motion to suppress, the judge asked the parties to submit further written briefs on the legal issues he saw as key: the import of the ambiguous invocation of a defendant's right to speak to an attorney (id. at 248-49); once a defendant articulates a desire to speak to an attorney, what is the effect of the defendant then volunteering incriminating statements, in that does this voluntary proffer justify an officer to inquire whether or not the defendant is still asserting his right to counsel (id. at 249); and if there is an assertion of the right to counsel at one juncture is there anything that would eliminate that taint apropos

subsequent police inquiry and statements by the defendant (id. at 249-50).  The Court

explained: "This is obviously an extremely important matter, and, as often happens, I

think this is factually quite complex, and raises a number of legal issues…"  (Id. at 252.)

A schedule for written submissions to be followed by oral argument was then set up.  (Id.

at 252-54.)

In his post-hearing memorandum defense counsel addressed the legal issues

highlighted by the court, but also argued:

> With respect to the voluntariness aspects of the requisite waiver in
> this case, the Defendant requests that this Court take into account that, as
> stated above, there is a certain element of coercion in the conversation that
> took place on the ride from the Windham Police Station to the
> Cumberland County Jail in that the officers discussed topics which would
> undoubtedly raise concerns in the Defendant's mind.  Since any accused in
> such a situation would be keenly interested in determining the exact state
> of knowledge of the authorities, it is difficult to conclude that under the
> circumstance that an individual in such a situation would be able to decide
> whether he wanted to relinquish his right to be free from such
> interrogation in the absence of a lawyer with "full awareness" of the nature
> of that right and the consequence of abandoning it.
> Furthermore, the Defendant directs the Court's attention to the fact
> that the Defendant was placed in the cruiser to be transported from
> Windham to Portland without any shoes or other covering for his feet
> since his footwear had been taken from him during the investigation.
> Additionally, at the time of the drive from Windham to Portland it was
> approximately 9:45 a.m. and the Defendant had thus far been offered
> nothing to eat despite the fact that he had been in the custody of the
> authorities since approximately midnight the evening before.  While the
> Defendant does not argue that such physical deprivation was so egregious
> as to itself rise to the level of coercion, certainly these factors must be
> taken into account in that they undoubtedly had some effect on whether
> the Defendant believed he had any rights at all and, more importantly,
> whether those rights would be recognized and adhered to by the
> authorities involved in the investigation.

(Def.'s Mem. Law at 14-15.)[3]

---

[3]    The State did not provide the court with a copy of the prosecutor's memorandum.

During oral argument defense counsel insisted that the circumstance of Martin's transport by Detectives Ramsdell and Lyons when they discussed finding the car in front of Martin was a "Christian burial situation."[4]   (Oral Arg. Tr. at 13-15.)  After this specific inquiry was pursued, defense counsel urged the court to also look at this factual issue concerning whether the officers were attempting to elicit incriminating comments in the context of the entire course of interactions Martin had with law enforcement personnel.  (Id. at 22.)   Counsel explained that it was "easy to get enthralled" with the prosecutor's "analysis of everything in a piecemeal basis," and stated: "I think it's important to remember that the entire incident took place over the course of twelve hours, five of which the defendant was asleep, so you can't really parse them up that carefully. You've got to look at the circumstances in a whole and how they tie into the other."  (Id. at 22.)

Addressing the prosecutor at one point during oral argument, the motion judge explained:

> [T]he issue of voluntariness in some ways is a puzzling concept.
> Listening to Mr. Martin on the tapes, observing him here, he struck me as
> in a somewhat unsophisticated way as worldly, calculating, alert,
> protective of his self interest, and trying as much as possible to exercise
> control over[,] that night[,] the situation that he found himself in.  To what
> extent if that is my conclusion about how he was conducting himself that
> night, to what extent does any finding of police misconduct in the sense of
> that they were not scrupulous in observing his Miranda rights for example,
> to what extent does that perhaps undermine any finding of voluntariness[?]

(Id. at 38-39.)  The prosecutor responded that he thought, supposing there was a Miranda violation, it "does not per se raise the issue of voluntariness."  (Id. at 39.)

The motion judge's opinion on the motion to suppress is meticulous and cogent. Although – in light of the several discreet suppression arguments pressed by the defense -

---

[4]      See Brewer v. Williams, 430 U.S. 387 (1977).

- the general, totality-of-the-circumstances voluntariness of the video-taped confession at the Scarborough Barracks was not the sole focus of the court's factual and legal conclusion, the court certainly considered the totality of the circumstances.

The suppression judge noted that when Martin arrived at the Windham police station he was "soaking wet, his face was swollen, there was blood on his chin, and the top clasp of his pants was undone." (Suppression Decision and Order at 6.)  With regards to the interview at the Windham station that commenced at 2:20 a.m., the judge found that Martin "was asleep in the interview room during the break between the interview by Detective Ramsdell and the interview conducted by Detectives Holt and Herring.  (Id. at 10.)  Holt testified that at the start of this interview Martin was still dressed in his dungarees and white sneakers.  (Id.) Pressed for an explanation of why there was so much blood on his clothing, Martin suggested that he might have rubbed against the car that stopped for him; he then consented to the officers taking his shirt, trousers, and sneakers so they could be tested for blood.  (Id. at 10, 12.)  At this juncture Martin was allowed to use the bathroom facilities.  (Id. at 10.)  "Later in the interview" the judge found, Martin "expressed discomfort with his wet clothing, including discomfort caused by all the blood on his clothing."  (Id. at 13.)  "The clothing was taken from him and he immediately received a new pair of pants." (Id.)  However, Martin "did not receive a replacement shirt until he was taken to the Cumberland County Jail later that morning."  (Id.)  The judge found that by the time Martin was arrested at 9:00 a.m., Martin had been asleep since the 4:05 a.m. completion of the Holt/Herring interview.  (Id. at 15.)

Regarding the video-taped interview at the Scarborough Barracks, the motion judge found that at the outset of this interview Martin confirmed that he had asked for an

attorney while at the Cumberland County Jail but that now he was willing to answer questions without an attorney.  (Id. at 18-19.)  Nevertheless, Detective Lyons read Martin his <u>Miranda</u> warning and, again, Martin indicated his willingness to speak, and then confessed to the murder of Vincent Irish.  (Id. at 18-19.)  The court also found: "Because of his substantial criminal history, he has previously been exposed to the <u>Miranda</u> warnings and police interrogation."  (Id. at 19.)  After this interview was completed, the judge noted, Martin went into a conference room where he was given lunch, which was the first food he had had since eating a sandwich sometime before the murder on the preceding night.  (Id.)

In the "Principles of Law" section of the suppression decision, as relevant to this 28 U.S.C. § 2254 claim, the hearing judge observed:

> The term "interrogation" under <u>Miranda</u> refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect . … A practice that police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to an interrogation."  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301.

(Id. at 21.)

In the section of the decision setting forth the hearing judge's conclusions, the judge found:

> All of the statements made by the defendant on March 27, 1988 to the police were voluntary.  The defendant's will was not overcome by any police conduct.  He was alert, calculating, self-protective until he was arrested, and in full control of his faculties during all of his contacts with the police.  Although defendant may have made misjudgments about what steps were in his best interest, those misjudgments do not render his statements to the police involuntary.

(Id. at 22.)  "The videotaped confession of the defendant at the Scarborough Police

Barracks," the judge observed,

> came only after the defendant had indicated a desire and willingness to
> talk to police officers and knowingly, intelligently and voluntarily waived
> his Miranda rights.   Once again, defendant makes clear that his own
> evaluation of his situation changed dramatically after he was arrested.  He
> then felt that no purpose would be served by trying to conceal from the
> police what had actually happened, and he thus indicated at his own
> initiative, beginning with the statements in the car en route to the jail, that
> he now wanted to talk to the officers.

(Id. at 26.)

The decision on direct appeal as to Martin's confession related Miranda/

voluntariness claim was as follows:

> [D]efendant argues that he was in custody during the entire interview with
> Detective Ramsdell at the Windham police station and was therefore
> entitled to be advised of his Miranda rights. Custody for the purposes of
> Miranda exists if a reasonable person would believe himself to be in
> custody and would feel himself restrained to the degree associated with a
> formal arrest. See State v. Gardner, 509 A.2d 1160, 1163 (Me.1986). The
> motion justice's finding that defendant was not in custody at any time
> before or during his initial interview by Ramsdell at the police station is
> supported by the record. Defendant himself had provided the story that
> caused him to be brought to the police station as a possible witness to a
> crime. Once at the station, defendant thought he would be able to leave
> after giving a statement to the police. He telephoned his mother just before
> the interview with Detective Ramsdell and told her that he was going to be
> at the station for a while and would need a ride home later.
>           Finally, defendant argues that all the statements he made after he
> invoked his Miranda right to counsel must be suppressed because the
> police officers initiated all further conversations with him. Once a suspect
> asserts his right to counsel, authorities may not question him further unless
> he makes a knowing and voluntary waiver of his Miranda rights and
> "initiates further communication, exchanges, or conversations with the
> police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); State v. Grant,
> 571 A.2d 1203, 1205-06 (Me.1990). The motion justice's determination,
> that the State met its burden of proof to show that defendant's subsequent
> statements were made voluntarily and after he and not the police had
> initiated the further discussions, has a rational basis in the record. During
> the drive from the Windham police station to the Cumberland County jail,
> Detectives Ramsdell and Lyons discussed in a general way the status of an

ongoing murder investigation, Ramsdell at one point asking Lyons about the car found on Nash Road. Defendant, overhearing the officers' conversation, concluded that the police had found the car with Irish's body, confirming his earlier belief that he was "cooked." He asked the officers if Maine had the death penalty for murder. On being told that there was no death penalty in Maine, defendant commented that it was nice to know that the officers would be paying for his care for the rest of his life. A few minutes later, defendant asked Lyons who decides whether to charge for murder or manslaughter. Defendant's questions were an attempt on his part to find out what might happen to him, and not, as defendant now would have it, responses to disguised interrogation by the police.

The statements defendant made concerning the ownership of the ring at the Cumberland County jail were correctly suppressed because the police obtained them after defendant had asked for a lawyer and without his waiver of that right to counsel. Soon after those comments, however, the officers did again give defendant his <u>Miranda</u> warnings, and it was after these renewed warnings that defendant said he was ready to talk to them without an attorney. At the State Police barracks, just before giving his videotaped confession, defendant made clear that he understood his right to counsel and repeated his explanation as to why he no longer wanted to talk to a lawyer. Defendant's later comments at lunch to the two officers were made after having received <u>Miranda</u> warnings both before and after his videotaped confession. On this record the motion justice was well justified in finding that defendant's answers and comments were all voluntary and not the result of interrogation by the officers.

Because the evidence provides a rational basis for each of the motion justice's rulings on the suppression of defendant's statements, the motion justice's determinations must be sustained on appeal.

<u>Martin</u>, 580 A.2d at 681 -82.

Given the totality of the record, the motion judge's and the Maine Law Court's conclusions that there was no totality of the circumstance basis for suppressing this confession are not reproachable under the deferential standards of 28 U.S.C. § 2254(d) and (e)(1). Both courts reasonably applied a standard that was consistent with the clearly established Supreme Court law and the factual findings underpinning of these conclusions were not unreasonable, <u>see</u> 28 U.S.C. § 2254(d)(2), when viewed in light of the evidence cited above. On this score I add only that I have viewed the copy of

Martin's confession at the Scarborough Barrracks and absolutely agree that it is strong

evidence that Martin was in full control when he decided to speak to the detectives

without an attorney and that he remained alert and cool headed during the entire course of

his question and answer period.  See cf. Scott v. Harris, __ U.S. __, __-__, 127 S.Ct.

1769, 1775 -76 & n.6 (2007); id. 127 S.Ct. 1781 -82 & n.1 (Stevens, J. dissenting).

#### Second 28 U.S.C. § 2254 Ground: Counsel's Failure to Investigate Martin's

#### Psychological History

"A criminal defendant claiming a Sixth Amendment ineffective assistance of

counsel violation must" under Strickland v. Washington, 466 U.S. 668 (1984) must:

> establish that (1) 'counsel's representation fell below an objective standard
> of reasonableness' and (2) 'a reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding would have been
> different.'" Smiley v. Maloney, 422 F.3d 17, 20 (1st Cir.2005) (quoting
> Strickland, 466 U.S. at 684). Under the first prong of Strickland, there is a
> "strong presumption" that counsel's strategy and tactics fall "within the
> range of reasonable professional assistance," and courts should avoid
> second-guessing counsel's performance with the use of hindsight.
> Strickland, 466 U.S. at 689.
>> It is all too tempting for a defendant to second-guess counsel's
>> assistance after conviction ..., and it is all too easy for a court,
>> examining counsel's defense after it has proved unsuccessful, to
>> conclude that a particular act or omission of counsel was
>> unreasonable.
> Id.  It is only where, given the facts known at the time, counsel's "choice
> was so patently unreasonable that no competent attorney would have made
> it," that the ineffective assistance prong is satisfied. Under the prejudice
> prong, not all errors by counsel are sufficient to meet the standard of a
> reasonable probability that, but for the counsel's errors, the result of the
> proceeding would have been different. Id. at 693-94. Rather, "'[a]
> reasonable probability is a probability sufficient to undermine confidence
> in the outcome.'" Smiley, 422 F.3d at 20 (quoting Strickland, 466 U.S. at
> 694). This is a "highly demanding" and "heavy burden." Williams, 529
> U.S. at 393. A defendant's failure to satisfy one prong of the Strickland
> analysis obviates the need for a court to consider the remaining prong.
> Strickland, 466 U.S. at 697.

Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006).

With regards to Martin's belief that his attorney was ineffective when measured by the Sixth Amendment standard, Martin argues that counsel should have investigated his psychological history.  (Sec. 2254 Pet. at 6.)  He explains that he was incarcerated in the Arizona Department of Corrections from 1984 until 1988.  (Id.)  While incarcerated Martin was prescribed medications by the prison psychiatrist but he never underwent a psychological evaluation.  (Id. at 6-7.)  When he was released from this imprisonment his medication was abruptly stopped and seventy-one days later he was arrested for murder.  (Id. at 7; Attach 2 at 1.)  Martin asserts that the attorney representing him on this murder charge received funds to hire Doctor Bruce Kerr to serve as a consultant for all psychological issues in the case.  (Attach. 2 at 1.) Martin discussed hearing voices with Dr. Kerr but Dr. Kerr thought that he was faking it.  (Id.)  Counsel never asked Martin about his medical history nor did counsel discuss possible defenses with Martin.  (Id.) According to Martin, counsel felt there was some bizarre behavior on Martin's part but never discussed with Martin how the bizarre behavior related to criminal conduct.  (Id.)

In his amended post-conviction review petition, Martin's attorney presented six grounds, the fifth of which was:

> The Petitioner's ex-attorney failed to reasonably investigate and present whether any diminished capacity, mental disease or defect, or insanity issues were applicable to this case.  He failed to reasonably investigate if there was a diagnosis which supported the prescribing of anti-psychotic drugs to the Petitioner while in prison in Arizona, and which the Petitioner had recently run out of just prior to the incidents in question.  He further failed to reasonably investigate the voices the Petitioner was hearing prior to the incidents in question and failed to investigate and have medical/psychological evaluation performed regarding the Petitioner's mental status at the time of the incident and at the time of the Petitioner's plea.

(Am. Post-conviction Pet. at 2.)  In his "Pleading Alleging More Specificity" filed in

response to the State's motion to dismiss, Martin further fleshed out this ground:

> Please note the State has not alleged any failure of specificity with regard
> to Ground 5.  However, see Ground 1 for further clarification.[5]  Also note
> that were Petitioner to be suffering from schizophrenia, or some other
> severe psychological disorder this could have affected and been
> admissible on the issue of intent, leading to a potential not guilty verdict;
> additionally it could have led to an insanity defense, diminished capacity
> defense, mental disease or defect defense and likewise could have led to a
> defense based upon homosexual rage, for example.  There was other
> evidence that was available to trial counsel to bolster Petitioner's
> contentions that he was suffering from a psychological disturbance prior
> to, during and after the alleged incidents, that he felt compelled in many
> respects during the alleged incidents and could not appreciate the
> wrongfulness of his conduct, and that many aspects of homosexual rage
> were present and available if one reviewed the Department of Corrections
> record in Arizona and took an effective history from Petitioner.

(Pleading Alleging More Specificity at 3.)

> With regards to this challenge, the Post-Conviction Court explained:

> Defense counsel hired Dr. Bruce Kerr to determine whether any
> state of min[d]/psychological defense was available to the defendant.
> Defense counsel sought to avoid the State Forensic Service which he
> believed was, at the time, a "hired gun" for the prosecution.
> Although defense counsel did not recall whether he had the
> defendant's records from the Arizona Department of Corrections, the
> petitioner admitted at the hearing on the petition for post-conviction
> review that he never discussed his psychological history with defense
> counsel.  See Def.'s Ex. 2; 11/11/01 Transcript at 38, 90.  The petitioner
> discussed his history with Dr. Kerr.  See id. at 90.  The Kerr report reflects
> that the defendant's incarceration from approximately age 11 through his
> release in 1988 but the records are not mentioned.  See Kerr Report at 4-5.
> The report was generated for sentencing.  See 11/11/01 Transcript at 37.
> Portions of the defendant's Arizona records were submitted with the
> defendant's memorandum in aid of sentencing.
> During the period of time that defense counsel handled this case,
> he believed that state of mind/psychological defenses were not favored by
> juries and he was not inclined to try such a defense to the justice assigned
> to the case.  Defense counsel concluded that he needed a substantial
> psychological defense because if the assigned justice did not accept the
> defense, the case was "an almost walking life sentence."  See 11/11/01

---

[5]     Ground 1 related to counsel's decision not to call an expert witness for the suppression hearing.

> Transcript at 40.  Dr. Kerr did not provide any support for such a defense and, in fact, determined that the defendant was trying to "fake bad" or malinger.  <u>See</u> Kerr Report at 6; <u>see</u> <u>also</u> Petitioner's Ex. 4 at 2.
>
> Defense counsel had previously handled a case in which the defendant had had seventeen hospitalizations, was bipolar, and was not taking his medicine.  The defendant killed two people and burned down a house.  The jury rejected the insanity defense.  Based on that case, defense counsel's experience with insanity defenses, defense counsel's opinion of the State Forensic Service at the time, and the information about the defendant, defense counsel determined that there was insufficient state of mind/psychological defense to risk a life sentence for Mr. Martin.  <u>See</u> <u>Levesque v. State</u>, 664 A.2d 849, 851 (Me. 1995) (deference to strategic or tactical decisions of trial attorney is substantially heightened); <u>State v. Twist</u>, 617 A.2d 548, 550 (Me. 1992) (such decisions reviewable only for manifest unreasonableness); <u>State v. Lagassee</u>, 655 A.2d 328, 330 (Me. 1995) (assessment of defense counsel's conduct takes into account all circumstances of case known to counsel).

(Order on Post-Conviction Review at 3-4.)  Martin turned to the Maine Law Court seeking a certificate of probable cause and in his counseled memorandum his single argument was:  "Counsel's performance in dealing with psychological factors was so ineffective as to violate Appellant's right to assistance."  (Counseled Mem. Request Accept Appeal Denial of Post-conviction Relief at 6-11.)  The Maine Law Court rejected the request for further review.  (Order Denying Certificate Probable Cause at 1.)

I have reviewed the transcript of the post-conviction evidentiary hearing and it is evident that the state post-conviction court's conclusion apropos this claim withstands the deferential 28 U.S.C. § 2254(d) and (e)(1) review standards.   Post-conviction counsel for Martin summarized Martin's argument as follows:

> The question is whether or not Mr. Martin was, one, competent at the time that he committed this crime and, two, whether or not his counsel adequately explored the issue of mental disease or defect as a defense.  Because of that there was an evaluation, a Stage I forensic evaluation, done in 1999.   That report seems to indicate that Mr. Martin was competent at the time that he committed the crime, although he doesn't really adequately explore the possibility that he was suffering from a

mental disease or defect that would have taken care or would have formed
a defense to the crime that was charged with, in this case murder.

(Post-Conviction Hearing Tr. at 16-17.)  Counsel explained that it was Martin's intent to

press for an independent psychological evaluation within the context of the post-

conviction proceeding to bolster his case that his trial counsel did not adequately prepare

Martin's case for trial.  (Id. at 17.)

      Martin's trial counsel, who had become a judge by the time of the hearing,

testified at length and this testimony was careful and considered.  He explained that there

were "a bunch of important issues" to be addressed at the time he started defending

Martin.  (Id. at 29.)  The first issue was "whether we could in any way eliminate or

minimize some of the who-done-it variety.  (Id.)  He hired an investigator and he also

went to the scene and talked to eye witnesses there towards determining whether or not

the witnesses actually could have seen what they reported.  (Id. at 28-30.)  He further

pursued the motion to suppress discussed above and he confronted serious issues related

to Martin's sentencing exposure before the assigned judge known for his severity.  (Id. at

30-31.)

      With respect to the psychological issues in the case, trial counsel explained:  "And

then I wanted to know what was making him tick because in this case there was sort of a

psychological tone to it.  I mean, I wanted to see if there was even the remotest

possibility of some kind of psychological thing.  And so I hired or got Bruce Kerr

appointed," (id. at 30), rather than relying on the then prosecution-friendly State Forensic

Service (id. at 34-35, 55).   He retained Dr. Kerr because he considered him "the

preeminent forensic psychologist in Southern Maine," (id. at 31), was remarkably candid,

had "pretty good insight into all of the typical Title 17-A issues," he could be counted on,

and would hold up under cross-examination (id. at 35).  "If there had been some sort of a reasonable possibility of a psychological defense, either NGRI[6]-type defense or an abnormal state of mind," counsel explained, he would have made use of it if it was prudent given the difficulty of succeeding in the post- Hinkley verdict climate.[7]  (Id. at 32-33.)   Martin's attorney indicated with respect to his decision not to seek a Stage II evaluation that he came to a conclusion that this was not a "strong and viable defense." (Id. at 39.)  "And by defense," he added:

> I don't mean just not guilty type of defense, I mean either something we could use to go to a NGRI or something we could use to maybe knock it down from murder to a manslaughter, something like that. And I don't remember what it was but I remember there was some evaluation about the risks of that either in front of a jury, in which case we had better have a real winner because remember [Hinkley]– or in front of a judge and the [justice assigned had an] affectionate nickname of most of the bar at the time as the Ayatollah.  And this case was in our worst case scenario a sentencing nightmare and I did not want to get [the assigned justice] in a position where he had unfettered sentencing discretion.  We had to stop that because ---  and if we had gone to trial on any kind of psychiatric or psychological defense and won then that would have been fine.  But if we lost then he could have gotten his teeth into Mr. Martin and, based on my evaluation of that case, that was an almost walking life sentence.  And Mr. Martin was young, I thought he had – there was some hope for rehabilitation.  I thought that we would – hopefully we could do something with him in the sentencing end.
> And so we had to balance out all those factors and the sentencing factor won.  I remember that very clearly because we were deathly afraid of getting – just allowing [the assigned justice] to sentence him to a life sentence.

(Id. at 39-40.)   Asked what in the case gave Martin's attorney a concern about a life sentence, Martin's attorney testified:

> Well, the first thing was his history.  He had an extensive history including a lot of violence.

---

[6]     NGRI stands for not guilty by reason of insanity.
[7]     John Hinkley was found not guilty be reason of insanity for the attempted assassination of President Ronald Reagen.

The second thing was pretty clear evidence in the record of basic sociopathy.

The third thing is that there was a – that it was a particularly cold-blooded murder. There was a – there was a premeditation aspect to it, and by that I don't mean that we use premeditation as a term of art, I'm talking about a premeditation in fact.

There was talk about raising up the rent money by going and rolling a homosexual in Portland.  There was talk about robbery and cash motive was a clear motive here.  And the business of stealing the gun from his father or stepfather, or whoever it was, and sawing the barrel off and getting some yarn and making a little sling for it, and then getting a ride up to Portland with the specific and stated intention of rolling a homosexual.

And then the added statement about – when asked, Why did you need the gun, because witnesses – something – dead witnesses don't talk or something to that effect, that makes it – and then that makes it, the premeditation aspect of the premeditation in fact and the robbery, and the pecuniary motive of it, I think, made it a particularly dangerous crime.

And then probably the next thing and the worst thing was, after he shot the fellow in the head and put the fellow in the trunk … he came to the understanding that this fellow was still alive and then smothered him. So he had one last chance to save this victim and he didn't, he smothered him.

And then [he told] the investigators that he would have kept on doing it until someone caught him. …
….

And then we had [the assigned Justice] , who was one of the – Superior Court justices run the range, where they had McCarthy at one end and [the assigned Justice] as another end.  In fact, [the assigned Justice] was so famous that one time in Cumberland County they had a huge backlog of cases, huge backlog in the Superior Court; so they set up – in one month they set up several hundred cases on this massive trial list, and right at the top it said, all trials will go to trial with [the assigned Justice] and all pleas will be in front of McCarthy.  They drained the courthouse of pending cases and nobody wanted – you did not want to make a conscious effort to get in front of [the assigned Justice], a wonderful man but he was a member of the school of sentencing, which was, the biggest sentence you can give without gulping, which was what another justice in that school had said.  And I saw this as a clear – and [the prosecutor ] was talking about life sentence, he saw this as a life sentence case, too; I wanted to limit this case so [Martin] could get out.

(Id. at 63-65; see also id. at 68-69.)  He further noted that he was even concerned that the

assigned Justice would accept the 60-year cap agreement and was happy that he at least

did that.  (Id. at 66.)  By his calculations under the old good-time system this could

24

translate into 32 years, with Martin getting out when he was 57-years-old, whereas life with no possibility of parole would mean that Martin would only emerge from the prison in a body bag.  (Id. at 82.)

Martin's attorney could not recall having seen Martin's medical records from the Arizona Department of Corrections and, when questioned about the medications prescribed there, indicated that to his knowledge a lot of individuals took a lot of psychotropic medications for various illnesses and that this did not "mean that they rise to the level of generating a NGRI or diminished-capacity defense."  (Id. at 45-46, 48.)   He pointed out that he had just handled a case in which the defendant had seventeen hospitalizations and "was absolutely crystal clear bipolar" and "he was off his meds and he killed two people and a dog and burned a house down, and the jury didn't think that was very interesting."  (Id. at 48-49.)  He indicated that he had Dr. Kerr looking out for this sort of thing and "there wasn't enough here to generate enough to balance out in the equation the risk of a life sentence."   (Id. at 49; see also id. at 62.)

Finally, I note the following passage from Martin's criminal attorney's testimony when he was asked about his presentation of the plea agreement to his client:

> This was a murder case.  I was pleading a guy in a murder case, I did not
> do that lightly.  I not only spent a great deal of time anguishing about
> whether or not this was the right solution to the case but I also consulted
> with a couple of very experienced criminal trial lawyers, who I trusted and
> who were sort of – we had – there was a group of us who did a lot of
> criminal work back then who would call each other and talk about difficult
> cases.  And I consulted with probably four attorneys at the time just to
> make sure that I wasn't off[]track on what I was doing here.  In the
> presentation of that kind of discussion to --- and that kind of analysis to a
> client I would probably – I  -- it is so extensive and the kinds of questions
> that you get involved in are so extensive that that would have had to have
> been done in person.  In fact I remember doing it in person. … I remember
> distinctly having a very, very long conversation with him, going through

all of those soup-to-nuts of the case and coming to the decision to make –
to enter that plea.  And that was done in person ….

(Id. at 79-80.)

These excerpts from the evidentiary hearing on the post-conviction petition

demonstrate that Martin's criminal attorney was making the kind of tough strategic

decisions that form the quintessential example of a performance that survives Strickland

scrutiny. The United States Supreme Court has emphasized its,

> recognition that the duty to investigate does not force defense lawyers to
> scour the globe on the off-chance something will turn up; reasonably
> diligent counsel may draw a line when they have good reason to think
> further investigation would be a waste. See Wiggins v. Smith, 539 U.S. at
> 525 (further investigation excusable where counsel has evidence
> suggesting it would be fruitless); Strickland v. Washington, supra, at 699
> (counsel could "reasonably surmise ... that character and psychological
> evidence would be of little help"); Burger v. Kemp, 483 U.S. 776, 794
> (1987) (limited investigation reasonable because all witnesses brought to
> counsel's attention provided predominantly harmful information).

Rompilla v. Beard, 545 U.S. 374, 383 (2005).  This record demonstrates that counsel's

decision regarding not further investigating Martin's psychological history after

consideration of his consultations with a trusted forensic psychologist was a reasoned and

competent decision.  Compare Rompilla, 545 U.S. at 383-390; Dugas v. Coplan, 428 F.3d

317 (1st Cir. 2005).  Given this conclusion, it is even more evident that, under the

deferential 28 U.S.C. § 2254 review standard, the Maine post-conviction court's

Strickland determination neither was an unreasonable application of United States

Supreme Court precedent, see 28 U.S.C. § 2254(d)(1)[8]; Williams, 529 U.S. at 413, nor

"resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding"  28 U.S.C. § 2254(d)(2).

---

[8]     This case does not fall within the parameters of the "contrary to" component of 2254(d)(1) as there
is no United States Supreme Court case applying Strickland to "materially undistinguishable facts."

**Conclusion**

Based on the foregoing, I recommend the court deny Martin's petition.

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

January 9, 2008.